May it please the Court, my name is Robert Mewes from the Thomas More Law Center. It's my pleasure to represent the plaintiffs' appellants in this case. I'd like to reserve three minutes for rebuttal, if I may. Now, this case presents what we believe to be a very important First Amendment issue, and that's whether the government can prohibit a private citizen's political speech on a public street next to a middle school because school officials consider the speaker's message to be disruptive to the school. And here, in this case, the government's justification for doing so was invoking Section 626.8 of the California Penal Code. And we contend under well-established principles of the First Amendment that the government does not have the power to invoke or to make those sort of content-based restrictions of private citizens' political speech in a public forum, regardless of the fact that it happens to be adjacent to a middle school. What content-based restriction was made here? Your Honor, I think the evidence plainly demonstrates that the restriction was on the plaintiff's pictures. And as the case law, Forsyth County makes very plain that a listener's or a viewer's reaction to speech is not a content-neutral basis for prohibiting it. So if it's the message, in this case the pictures, that are causing a reaction, that, in effect, is a content-based restriction on speech. So by restricting the pictures … Well, I have several questions. One of them is, do we have to worry at all about whether the statute was properly or improperly applied? And there's a lot of discussion in the briefs about whether it was a lawful business, wasn't a lawful business. Does any of that matter? I mean, isn't our ultimate question whether, assuming the statute applies, is it constitutional to do this? Why does the rest of that matter? Well, I think, Your Honor, from the Court's perspective, I think you can either decide this case more narrowly in terms of a misapplication of this particular statute. No, but we can't. We're a federal court. How can we decide something based on a misapplication of a statute? Why don't we just say that's the statute, and can they do this? Well, obviously, I mean, that is what they did. And so at the end of the day, the question is whether … I think it's a little befuddled about why there was so much discussion about the meaning of whether they properly applied the statute. I don't understand why it matters. Well, the judge, obviously, below, considered it to be a proper application, and he focused on the unlawful business. And so, in effect, by applying that statute to our … Well, I suppose it wasn't. But why does that matter? That's what I'm trying to understand. You're coming here with a constitutional claim. That's correct. Which is, they can't do this to us, essentially. Yes. Yes. And whether they did it validly or invalidly under state law just seems to me to be irrelevant. Is there any reason … Am I missing something? Well, again, I think, and we made a point to this in the brief, and relying on Grainard in this respect, the government may have a significant interest in prohibiting conduct that disrupts a school during a school session. Well, the facts show that in this case, that they were actually engaging in their activity prior to the school arriving. You're not facially challenging the statute in any respect at all, right? I'm sorry, Your Honor? You're not facially challenging the statute in any respect. That's correct. Because the statute itself has expressed provision saying that it should not be used to impinge the lawful exercise of constitutional rights. So I view, I mean, the California legislature has made it plain that this statute should not be used in the way that it was in fact used. All right. Well, that's just clarifying to me to get the statute out of the way, because it doesn't seem … Let me ask you this. We have a Supreme Court case, the Grainard case, that says that various forms of otherwise protected speech-related activity or speech can be prohibited if they're disruptive to a school. I mean, we know that. The real question then is, okay, how much is the disruption? And how much disruption was there? We had some. We had some real testimony as to … I mean, there was real evidence of disruption. And your argument is there just wasn't enough? Well, I think two points, Your Honor. With regard to the Grainard case, I mean, they made it plain that they were applying a content-neutral basis. So, for example, if it was … The statute is content-neutral. And are you arguing that there simply was not enough disruption to come within the Supreme Court case? I would say, first of all, to answer that in two ways. First, regardless of the disruption, if it's a content … You can't make those sort of content-based restrictions. Grainard made very clear that the government has no power to restrict activity because of its message. I understand that. It's not my question. My question is, assuming that the statute is content-neutral, are you arguing that there is insufficient disruption? That would be the second part. I think, first of all, even if it's content-neutral, it can't be applied in a content-based manner. If your basis for saying there's disruption is the content of the message, even Grainard says that's not a legitimate basis for doing so. Secondly … Well, you see, content is hard in a way. It sounds like it's easy because we're so accustomed to talking about it that way. But content and manner of expression are often quite closely linked. I mean, you could have had somebody outside talking in a soft voice to anyone who was willing to approach, arguing sort of gently against, and so on. You could do it that way. Or you could have a picture on a truck that drives past with a security vehicle following it. Let me ask you this, and I understand it's not your case, but let's assume that this could have been you. And we get undisputed evidence that the first and second graders who have just now been able to learn to read are crying almost uncontrollably. Now, that sounds like a disruption. Are you saying that because it's content-based, because they're reacting to the mode of expression of the content, that you get to do that outside of school? I think under Graydon, that's the answer. Because you run into, I mean, that's the typical difficulty we have. I mean, we obviously have a First Amendment. We have a free society that needs breathing space. And I understand it's a very difficult, that's a difficult question. It's one that obviously strikes at you viscerally, but at the end of the day is, are we going to allow certain content-based restrictions? There are various kinds of you. I mean, there are adults, high school students. My example was deliberately chosen to go the other direction. I did K-3. You've got middle schoolers. I mean, kids at different ages react very differently. And what may be perfectly appropriate mode of expression to an adult may or may not be to a small child. You've got to concede that. Certainly. But again, looking at Graydon, Your Honor, I just think that Graydon makes it plain that the content cannot serve as that basis even if there is a disruption. So I think that's the first layer. But I do want to get to that second point because I don't think there was a material or substantial disruption to the facts of this case. Can I just ask a question? Yes, ma'am. We have here a moving truck. So A, it's moving, right? There are all these picketing cases that say moving. I don't know why, but they say it. Moving makes it different. Second of all, you have a very big truck, as I understand it, with a very big picture. Is there some – in other words, I have a vague recollection that in Mattson, in one of those cases, there was some discussion about how big the signs were and where they could be seen from. Does it make a difference that – this is sort of like shouting, except it's shouting silently with a big truck. Does that make a difference in terms of whether this is dealing with the non-speech aspects? Because a lot of what was concerning them was the truck was moving, there was a very big sign. If you had a little sign and a little placard, maybe the reaction would have been different. All right. I guess a couple of points to that. One is certainly where they were driving, trucks of that size were permissible. So in terms of the size – But they weren't driving around in circles. My understanding is that this truck was just going around in circles. It was a pretty – I don't know if you had an opportunity to view the video evidence that was presented, but it's a pretty large loop around. I forget how many times it actually passed through. I'm just picturing it myself. But in fact, if the truck was moving, it probably provided less of a security issue because they're traveling, they're obeying the traffic laws, they're ensuring that it's moving safely, it's not blocking, it's not obstructing. When you get into the question of, okay, the larger picture is more effective speech, the smaller picture is ineffective speech. So – But it's more intrusive and more – especially when you're dealing with children – more likely to – I don't know how to say that – to say something other than the content of it. But where do you draw – is it a 12 by 12 is okay, a 4 by 4 is okay, a 25 by 25? I mean, that's a problem ingrained in, too, how loud is too loud. It's measured by the actual disruption, as I understand it. Right. But again, that's – the loudness is not the same. When – I mean, the case law is plain that a reaction to the speech – in this case, a picture, a silent picture – that is a content-based restriction. I mean, the case law says that. I don't know how we get around that. There's an Osnick as well as another case where they said even just trying to shield minors from these pictures from on the highway. Well, Osnick is probably the closest case, Dan, actually. And it made very plain that you can't – as soon as the government – and even Cohen, I think. I mean, there's some of the – you know, the cases have said, well, what about, you know, Cohen? Under the school speech cases, Frazier, Hazelwood, Tinker, you know, Cohen perhaps couldn't wear his jacket in the school. But under Cohen, you can't prohibit Cohen from wearing his jacket walking on the public street outside the school. And I think that's one of the – Well, I'm not sure that's true of Cohen. I mean, Cohen's obviously not that case. That's right. And what we're talking about in the Greenard case is disruption of activities that go on in a school. So I'm not sure whether it's on the street and disrupting what's going on in the school or actually within the school building is the constitutionally determinative line. Well, I think the determinative line is – first and foremost is if you're basing it on the content. I mean, Greenard made very clear the ordinance gives no license to punish anyone because of what he is saying. I mean, the court made that specifically plain. Another interesting question is you, in fact, did not plan to be there while school was going on. Your clients were planning to get out of there, and they did because they were stopped. That's correct. Sort of ironic. But suppose that wasn't their scheme. Suppose their scheme was to keep driving around all during school, and there were big windows, and people would be – students, while they were in class, would be distracted by these pictures. Was your position to be the same? My fundamental position on the First Amendment issue is that you can't make those sort of content-based – So you would say they could just keep going around, or they could stand across the street with huge banners. That's correct. And everybody in the school could see, and classes could be disrupted, and that would be okay. Well, like what Cohen says, you avert your eyes. You close the blinds. You silence the heckler. I mean, that's what the – So your position is your client could stand outside or have a truck parked outside, maybe even flashing lights so long as they're not making any noise, forcing the stool if it wants to, you know, have the math class go forward to close the blinds and turn on the lights? Again, Your Honor, I think under the case law, those are the sort of costs that come with a free society with speech. If you're making the – if it's something other than the content of the message that you're – You know, I just don't think the case law gets you that far that it's to say that you can have some big visual distraction irrespective of its content. I mean, it can be your content or somebody else's content that forces the school to close the blinds and turn on the lights if they want to have math class. Yeah, and essentially, because, you know, Grainard sort of, I think, sidestepped the issue as it was made plain, I think, in one of the footnotes, that it wasn't an as-applied challenge, it was a facial challenge. So, I mean, it's a – that's a difficult question. But, again, I don't think under these facts we even have to go that far because for a number of reasons. One is they were operating their speech activity prior to the start of the school day, which Grainard said is permissible, and the student faculty audience is entering and leaving. And you've got to look at what was the fact of the disruption. The evidence is two or three girls were crying out of a class about 1900. The 10 or 12 boys were planning on throwing rocks, and they said one honors class spent some time talking about their activity. Sounds like a civic lesson. If you look at the objective facts, though, the class has started on time, the class has ended on time, no class was canceled, and the class schedule didn't change. All right. But you're looking for a broader – this is a prospective case. What injunction are you looking for? I'm sorry? This is a prospective case of this. Yes. I mean, first of all, we think that the application of the statute is unconstitutional as applied to their activity. I mean, I think the court can decide this broadly and narrowly. Why do the exact details matter? Doesn't what matter what an injunction would look like? What do you want enjoined? They want to be able to engage in their private – But, Your Honor, again, we would be satisfied with doing it prior to the start of the school day if it's within grainer. So, I mean, that – they just want to exercise – But it's a disruption – facts were entirely different. If there had been masses of kids out there crying and screaming and falling on the ground, you'd still have the same position. You wouldn't, Your Honor. I think under the first amendment – Your position would be the same. And you – I don't – I think the cases make it that way. And you want the injunction to read past any public school, K-3? You know, I think it's when they're on a – when you're on a public street. I mean, I don't think there's any – I don't think there's any way around it how you draw those particular distinctions. That's asking us to go well beyond the actual facts of this case. And that's – all we've asked in the brief is – and it doesn't have – you don't have to go that broadly. I mean, they – because they don't go to the elementary schools. They go to the middle schools and they go to the high schools. But we have to decide whether to go that broadly if we were to rule in your favor because we've got to draft an injunction or allow – give the district court instructions as to how the injunction's supposed to be drafted. That's correct. And that's why I'm saying – So how's it supposed to be drafted? You keep – I mean, you keep going from broad and back to now. If you look at the facts of this case, they limit their activity. I mean, what they want to do is what their activity is. Let me ask you this way to be clear. Draft the injunction you want and you think you're entitled to. Just give me a little – quick little sketch of it. That the government is prohibited under the First Amendment from prohibiting plaintiffs' peaceful, silent, non-destructive political speech activity on the public streets adjacent to the middle schools or high schools in the state of California. Because that's where they go to. Very school as well as before school. And you're being admirably, I think, consistent in your position. I'm not suggesting to push you away from it. But because I think you're taking the position you need to take. Because I think the broad question's a hard one, Your Honor. I really do think it's a hard one for this Court. But that's why I'm saying that the narrow one will help us do what we want to do. But it's not – but the injunction you just articulated and the injunction that you asked for in the brief and the only – in your complaint, the only injunction that makes sense given your legal position would apply during school and would apply regardless of the degree of disruption. Right? I mean, it has to be because – I think the case law commands that, Your Honor. But I'm saying on these facts and what we want to do, I don't know if you necessarily have to draft such a broad injunction. It doesn't make any difference. I mean, there are many things one can say about schools being different. But one of them is the age of the kids. And the other one is – and I'm not a big fan of captive audience theories. But this is a captive, captive audience in the sense that they are legally required to go to school to be there. No one's mentioned that feature anywhere in this case law. But does that matter that these kids don't have any option to not be there? And I don't think it raises the level of captive audience like in a bus where I think was an example that they view. So I don't – I mean, again, if you look at the lay of the ground and everything, I think it's hard to say that this is a captive audience in that respect. I understand that they're required to be there under the law. And I think that's where Grainard allows these content-neutral time, place, manner restrictions to take into account that particular factor of the disruption of the school. But I don't see how Grainard gets you to be able to do content-based restrictions. I mean, we're kind of back to it again. But it's that factor, the factors of the school and the age and everything else. But content-based to me, and maybe this is what Judge Fletcher was saying too, it isn't exactly what you mean. And I understand that's where the case law breaks down. But you're really saying the problem here is that the message was a disruption. I mean, it isn't that there was something else disruptive other than the message. I'm not quite sure that's true. But that's really your argument. What they were concerned about is they were going to – what we were showing, not that they were going to get upset by the noise or something like that. So whether that's content-based or not content-based, it is different than Grainard. Grainard. Yes. Yes. And the examples Grainard made for disruption, again, is this boisterous outpouring where the classes stop. So objectively, we don't even have that level of disruption. And it becomes – But you see, now that we've kind of pinned it down, your position would be the same if you did. Yes. It would be. Because I don't – I can't see how you can read the cases any other way. And I didn't write those cases, but that's – I don't see any other way. Very briefly, and assuming you'll get a little extra time to address the stop issue. Right. And obviously, it ties to whether or not they had the – properly stopped them in the first instance. We had a 75-minute detention. Certainly, this was beyond the momentary stop that is authorized under the line of cases in Terry. They took their driver's license. They ran license checks. They ran warrants checks. They weren't warranted for any criminal activity. And obviously, from our perspective, all they were doing was engaging in peaceful, non-obstructive political speech in a public forum. They had to let them go. Yes, but they were trying to figure out – you know, they were trying to figure out what to do. So they called the supervisors. They say, you know, I've never been in the – I never had this case before. I mean, they know how to deal with DUIs. They know how to deal with broken taillights. But this one's new, so they called the supervisors. So what's wrong with that? Well, I mean, there's – I mean, there's cases even where, you know, in the Supreme Court where they wait 75 minutes for a drug dog to arrive, and that was too extensive. If they – with just reasonable suspicion at that point, which is our belief that they only had, they had to let them go. They can't – you can't wait – Well, they did let them go. After 75 minutes. But it's – but it was a – It was really a fishing expedition looking – trying to find something. They stumbled upon this one statute. What relief are you asking for from this? That declaration it was a violation, and all we've asked here throughout this is nominal damages. A declaration and nominal damages. But you're not – you're not asking for an injunction on this? Well, the injunction, I think, would go to the First Amendment issue, really, Your Honor, because how do you enjoin them from not detaining them in the future? I mean, who's to say if they broke a traffic violation? Is there any case which has recognized the legitimacy of a stop to investigate not the facts but the law? I would think that they're supposed to know the law. They're not supposed to investigate it after they stop it. That's – I think that's where it comes out. Even, you know, with the qualified immunity question, it's kind of odd. They, you know, they impute them with the knowledge of what the case law, in fact, says. And I think that's – that would be my answer in terms of whether or not they're holding them just to figure out what it is that they've done. If they – you know, they see these pictures, and I think in their minds it's like, these things can't be here. So let's find a way to get rid of them. And they stumbled upon this. But this case, this problem is sort of an artifact of the Supreme Court case law that says that even if you don't have probable cause to stop them for whatever you stop them for, it's okay if you have probable cause in something else. So here they didn't have any – or reasonable suspicion. Here they didn't have any reasonable suspicion of anything when they stopped them because they didn't know what the law was. And later it turned out they came up with something. Well, they might have had reasonable suspicion of – It's like a vehicle. It looks like a police vehicle. Yeah. How about impersonating a police officer? I mean, it's very clear from the look of that vehicle that it looks like an unmarked police car. Unmarked in the sense that it doesn't say police on the side. But with the exception of no police on the side, I mean, I looked at that and I said, well, of course that's a cop car. Everybody knows that's a cop car. And in fact, on the tape you've got this guy in the BMW who stops, walks back and says, are you police? I understand precisely why he's asking that because it looks like a police car. Well, if I'm a policeman and I see somebody driving around in a car that looks like a police car, I mean, impersonating a police officer comes to mind. And to make that initial stop and to ask the initial questions, that's not problematic. I mean, if they have a reasonable suspicion, okay, look, there's a car that looks like a police officer, let's go see who's in this thing, they stop them, they ask them a few questions, check the licenses, see what they're doing, ask them what they're doing. The testimony is that they knew they were engaging in political speech. That vehicle and my clients are very careful about this because they know that they're a huge target because what they do is very controversial is to fall in law. Why did your clients need that vehicle? It also had a cage in the back, too. It does. Actually, at one point they hired... Did your client take prisoners? My client doesn't take prisoners. If I could ask, Your Honor, the... Well, what do they do with the prisoners? They don't take prisoners, Your Honor, I'm not sure. Did you say what do they do with the prisoners? They don't take prisoners. The vehicle, when they first started this program, they researched very closely what could and could not be put on the vehicle. And they ensure that it passed all the legal requirements. And they've done that. And it's obvious because even after they searched this thing they realized that they did pass one. Why do they need a vehicle? Because they get death threats all the time. They get threats all the time for what they're doing. The vehicle does several things. I think it helps deter people from wanting to cause violence because you have another set of eyes back there watching what's going on. The reason why they have the video camera is so that we can refute allegations that were brought up in this case. Why do they need a vehicle that most people would think was a police vehicle? It's a security vehicle. They used to hire on-duty police officers to actually ride along with them who could perhaps use their arrest authority but that became too costly for them so they stopped doing it but they didn't reconfigure the vehicles. There's nothing unlawful about the vehicle. The vehicle also helps the larger truck move in traffic. It provides when you have to change lanes or on the highways he can change lanes first and allow the other vehicle to go over. Actually they're doing  to be safe. Did they use the lights on the roof of the vehicle? No. I don't know what we call it with the lights on the roof but they don't use the lights other than the lights for if the vehicle is broken down for safety. Did they put those lights on the roof of the vehicle? Can I put those on my vehicle? You probably could. Like I said I know they research this issue very closely to make sure that they weren't violating the law when they configure their vehicle and the vehicle does not violate the law. I think the defendants acknowledge that that there's nothing about the configuration of that vehicle that's unlawful. I know I'm way over my time I did save some time for rebuttal. Thank you. Good morning your honors. Jennifer Lehman on behalf of the Sheriff's Department defendants. We have a co-defendant so I'm not sure how to split the time maybe half and half if that works well for everybody.  you should work out. I'm sorry your honor? It's something you should work out with your co-defendants. We'll split half and half if that's okay. I just want to talk a little bit about the Fourth Amendment issues that are addressed to the deputies. The deputies have reasonable suspicion to stop them based on the call that they received from the school as well as the concern regarding the police vehicle. What was the call? The call was that there's a truck out there that has an obnoxious something on there that's disturbing people. But the record shows that the deputies understood that to mean that there was a disturbance at the school. They understood that the school called because of this truck and they believed it to be because of the disturbance. What did they have probable cause of? They had reasonable suspicion that there was a disturbance at the school that they were violating the codes that provide that you cannot cause a disturbance at the school. Well, if that's true, what took them 75 minutes to figure out? Well, they had to inspect the vehicle, they had to talk to the school, they summoned a sergeant because they admittedly this was a situation that they could not face. Because they didn't know what they had a reasonable suspicion of? They didn't know what statute to apply? They did not know, well, they were concerned about it. They wanted to do it by the book, Your Honor. So they wanted to do it, they wanted to talk to the supervisor, they wanted to talk to the school. Did you know of any case in which it was okay to stop people for an hour or so, let's take out the first 15 minutes when they were actually investigating the car and checking these people out. After that, is there any case that says you can keep people around an hour while you figure out the law as opposed to while you figure out, investigate the facts? They knew everything they needed to know at that point, right? I believe they were investigating the facts. What facts were they investigating? What the disturbance was at the school. To bring out the school's administrator, to talk to the plaintiffs, to tell them what the disturbance was. My impression is, and it's only an impression, that they didn't actually even call that guy for about an hour. I don't believe that that's in the record, but I will submit to your honor. What was the call that came to the deputies? That there was a truck circling the school and making a call from neighbors or parents?  to address that question to me. I think there were. I believe that that is true. I tried to figure this out as to which call or calls they were responding to. I think by the time they showed up, there would have been more than one call. But the deputies understood it to be a call from the school, which certainly led a little more credence to the fact that there was a disturbance. In the end, the deputies decide that there has been a violation of the statute. Does your argument change when they say, well, we weren't just trying to figure out if there had been a violation of the law. We were just trying to figure out what the policy of our department was going to be. A lot of times there's a violation and you let the guy go with a warning. Oh, yeah, you were going 65 in a 60-mile-an-hour zone. Well, I'll let it go this time. That is true, Your Honor. And also under 66.8, you can have a school not permit  leave. We could have suspended the plaintiffs to leave because they were causing a disruption at the school. Again, all of this took time. As to the search, there was clear consent. I think what the plaintiff council is trying to do is to apply non-school  law to the school setting. The cases are clear that the schools can, in fact, have an obligation to prevent disruption at the school. I think the Jeglin case says you don't even have to have a disruption as long as you reasonably anticipate that a disruption is going to occur. In this case, there already was a disruption. Was it protests and every kid in hysteria? Probably not. But do they have to wait to that point before the school starts to act? I would submit to the court that the cases say no. I think I will leave the rest of that discussion to counsel for the school unless you all would rather have me as the target. Well, you're the ones who are enforcing the law, it seems to me. You're the ones who are constructing the laws applying to this and seem to me to be the primary defendants especially because the injunction that's requested will not be limited to the school. It could be, I suppose, but that's not what they're asking for. They're asking for an injunction that says that your department nowhere in L.A. County can enforce, stop them from driving their truck around schools and doing this. Well, the Sheriff's Department has to rely in large part on what the schools say. They have to rely on whether the schools say that there is a disruption. I don't think that the case law puts on the deputies the onus to go inside the school and say, I'm sorry, are you disrupted? Are you disrupted? I think they have to rely on the administration. Can you tell us somebody across the street from the school on a public  order to do something if there isn't an agreement? And suppose a bunch of kids got very upset about that because they were going to go to school. Would the statute apply to that? I think the administrators are in the best position to decide. If the administrators decided that nobody could be across the street from the school peacefully handing out leaflets protesting the wages at the school, that would be a reason for you to arrest them. I think if the administrators say there is a disruption in  school and there is no cause to the students, that the deputies have to rely on that. Your overall position is that any message when there is not a big sign and there is not any noise and there is not a truck moving around and you have presumptively First Amendment protected speech and the reason I chose leafletting is because there is lots of case law that says leafletting is the least objectionable form of on-street speech. Even so, if people were upset by the message, was on the piece of paper at the school, that would be and you would regard, you would think you had a basis for arresting people and telling them to go away. If there was a material disruption of the school and that was what was being represented to the deputies, then I would say that they probably would. So you see no distinction between public street speech near a school and speech in a school? I think that both the statute and the case law says that the rules that apply to school also apply to the ways that are adjacent to the school. What case law is that?  was Granite. Well, Granite was dealing with action, i.e. noise. All right. I'm asking whether when it's the, do you think Granite says even when it's the message? Now, did you think in Granite if these people who were making, doing a civil rights protest had been across the street from the school with little placards making absolutely no noise and there was one of them saying this school was violating their civil rights problems at the school that Granite would have come out the same way? I'm sorry, could you repeat that? Do you think that Granite would come out the same way if there was no disruption? If there was a substantial disruption to the school, I would say yes. I don't see how you can take that to the extreme. Again, this is all about the disruption at the school. It could have been a movie star on a truck riding around and around the school. If it had caused that kind of disturbance, I think that the school would have been right to call for assistance and ask that the disruption stop. Well, if the students are told by leaflets that the teachers are being unfairly treated,  are too low, that the working conditions are horrendous, and the kids get upset by that, and raise this issue with the school, I think that would be a violation of the statute. I can see that that's a more problematic case. Unfortunately, that is not our case. Graded says clearly, government has no power to restrict such activity because of its message. So, what do you make of that? You don't think that applies to this, or to the hypotheticals we're giving you? Well, in this case, the message kind of is the disruption. The message is what caused the disruption. So then you're restricting activity because of its message? Again, whatever the message is, again, it could be a movie star, it could be anybody. As long as there is a disruption, I think the school acts as it should, or has the right to act as it did. Does the court have any other questions? Is this a time, place, and manner restriction set forth in the statute? I would suggest that it is. They would have come there after     ban, and the message on the ban would have been, well, they would have said, well, we're not going to do that. Would that have been all right? You said after school started? Yeah, after it started. Again, I think it all just depends on the reaction, the disruption caused at the school. I mean, it's impossible for me to say what would have happened if they had come 20 minutes later, if they had come 20 minutes before. Suppose a locality, Pastor Norton, is saying that you can't have any billboards, political billboards that are visible from the school because that might cause people to disagree about political issues and cause disruption. Would that be okay? I think that that's problematic, Your Honor. Until there is some kind of disruption to support the notion that there is a disruption. Let's say the kids are in school and they're arguing and oysterously and maybe some fisticuffs, would that be enough to take the billboards down? Is this a wholesale to an entire county, no billboards by any school? I would think that would be overbroad. But this is wholesale. My understanding is that this is wholesale, i.e., you said that whether it's disruptive or not is up to the school and it doesn't have to actually be disruptive as long as they think it could be disruptive. So my understanding is that these plaintiffs have stopped doing this because they don't feel like getting arrested and it sounds like they're in pretty good fear of getting arrested is not ephemeral. I think the record actually is that they've done it since and they did it before with no issue and they did it after with no issue and just on this one occasion Well, they do say in their undisputed facts that they have stopped doing it. Was I wrong about that? I believe there's some testimony that they have continued to do it, Your Honor. It's in our separate statement of facts. So on this one occasion They were never actually prosecuted, is that right? No, Your Honor. They were not. Are there any other questions? Well, you say it's been as far as the client is aware of, it's been the same. The display is continuing. As far as  Your Honor, I believe that the plaintiffs continue to drive their trucks. And what was different here was that the Sheriff's Department got a call from the school because of the disruption that was going on in the school because of this vehicle, these two vehicles that were out circling the school. Yes, Your Honor. That there had been no issue with this prior to that one occasion. That on this one occasion they got a call from the school that there was a truck circling the school and it's causing a disturbance. The text that was sent to the deputies says there is a truck circling the school. But they understood that to mean that there was a disturbance. So somewhere in the translation between the dispatcher and the deputies it was translated to just there's a truck circling the school. Where in the record is the content of the telephone call? It's not in the record, Your Honor. I don't believe that. Just the text that was submitted to  It's not in the record. It's not in the record. Okay. Thanks. Well, all these calls are recorded out there. They are, Your Honor. But it's not in the record. It's not. You don't have much of a position then. You're saying that they came because they were told there was a disruption, but we don't have any idea whether they were told there was a disruption. There is the text of the call that they received, that it's typed to them in their cars. But you said that that one didn't say anything about a disruption. It did not. But they understood it to mean a disruption. Because they figured why else would the school call? And that, Your Honor, is in the record, what the deputies believe to be the call. All right. Okay. Thank you. Good morning, Your Honors. Julie Mullane on behalf of the defendant, Art Roberts. I don't understand how Art Roberts has any interest in this, frankly, at this point. I mean, they're looking for a prospective injunction, not simply for this school, against the police department, the sheriff's department doing this. I don't know what he did wrong. He just did he wasn't the one who was enforcing the statute. I'm a little baffled about why you have any interest in any of this. I may be as well. I can argue the school district's obvious perspective. I can obviously argue the constitutional issues that the school itself was confronted with. As far as Art Roberts' actual actions, I mean, there's no dispute as to whether there was, in fact, he pursued or perceived there to be a disruption. He presented testimony that and evidence that students were crying, students were milling around instead of entering the school building. He also said school began normally and got everybody into the building and started school. If he had not taken his actions, one wonders whether there would have been a further disruption. I think, I mean, he was out there for an additional hour and 15 minutes instead of leaving. But the children are in school, they're in their classes. What does it have to do with him calling? The truck was still there. It was disruptive, it was still there. The disruption as far as the effect of the disruption on the students itself, the students were in school at that point. At various points, as the truck makes the loop around the school, the truck is visible from the classrooms. Do we know what was true with respect to the position where it was stopped? Was the truck visible from the school windows from the classroom? That's correct.  don't know? We don't know, Your Honor. Let me ask you a different question. In paragraph 13 of Mr. Robert's declaration, he talks about plaintiff's presence created an enormous disturbance to the day's routine. Specifically, many of the students would not leave the sidewalk area surrounding the school after being dropped off pursuant to school rules. Many of the students who were upset or angry created a commotion which drew the presence of still other students. I had serious concerns with the heavy traffic caused by this incident. I was concerned about the students being dropped off on the sidewalks. In the period of time I've been there, we've had two kids killed and five kids hit by cars in similar circumstances. I saw the videotape and the videotape is focused on the back of the truck rather than scanning the sidewalks. During the portion of the videotape rather than the DVD that I saw, I did not see hundreds of kids on the sidewalks. Is there evidence beyond the declaration that there were hundreds of kids on the sidewalks? Well, other than the declaration and the testimony of Mr. Roberts, no. And that's what the District Court actually looked into that particular issue and found there not to be any... The fact that the video was not on Mr. Roberts has no effect on his testimony as to what he saw, what he perceived, and it's not necessarily discredited. The video wasn't on the sidewalk either except as it might sort of pick it up peripherally because it's focused on the back of the truck. That's correct, Your Honor. So you can kind of get a glimpse of the sidewalk. Just a glimpse. Just a glimpse. So, do you have a position on the sort of hypotheticals that I was talking about before? That is, here we have speech that has some conduct features. It was moving, the sign was very large and that sense was sort of like noise. But suppose you had sort of the most classic of First Amendment speech. A lone person standing across the street from the school handing out leaflets to the community. And people got upset. I would submit that if it caused a disruption in the operation of the school, then yes, it would more. So, but why, I mean, we have reams of law about the fact that people in general are supposed to, in a free society, you know, that there is a trade-off here and that we want people to be confronted with challenging ideas and that we don't shut  on public streets. Now, why is this different? This is different because we're dealing with children ages 11 through 13. Well, what if it's not across the street from California?   not across the street from California, then the district would have no means of controlling that particular. Well, we don't have any means of controlling this either. It's not your street. It's a public street. But California penal code section 626.8 and the education code section. Suppose it has a new penal code that said anywhere that there are children who might get upset on their way to school, you can't say anything that would upset them. And, again, the amount of the disruption probably would become an issue at that point. If it did not necessarily disrupt or limit, there wouldn't necessarily be any right of the school officials to limit that particular expression. Hazelwood is in a school and it deals with students. Yes. Tinker is too. There's a Supreme Court case which deals with pending now where there were students across the street from the school and there's an issue about what species of law applies to that. And you're now suggesting that the streets surrounding the school are insulated special streets. Was that the Frederick v. Morse case? Yes. That particular case, I believe, is distinguishable from this particular case. There was a general that particular scenario occurred where a student unfurled a banner, bong hits for Jesus, while the Olympic torch passed by. That particular situation dealt with a school principal who crossed the street, didn't like what was being said, specifically didn't like being what said and suspended the plaintiff. There was general disarray or the disruption had anything to do with what plaintiff did. The absence of that disruption, I think, makes it distinguishable from the case at hand. The general rule under the First Amendment, however, is that we don't have hecheros vetoes. That's foresight in a whole lot of other cases. The fact that people are upset by a message is not usually something that we deal with under the First Amendment. We say, that's your problem. And I think the problem is in the case at hand, we're dealing with a content neutral restriction, a proper time, place and manner restriction that is in fact content neutral. It could have been anything. It could have been pro-war, it could have been anti-war. Again, like counsel said, it could have been a movie star, it could have been a radio station across the street. But that, of course, was true in the   And I think there was some foresight as well. The whole point of foresight was that somebody shouldn't have to pay because somebody else doesn't like what they're saying, whatever they're saying. But again, I mean, we're dealing with the reality that school is in fact required, children are required to go to school, basically increases the duty owed by the administration basically to protect that duty, the duties that were owed to the students. Well, fascinating case. It is a fascinating case. Thank you, Your Honor.    so I'm going to cover a couple of points regarding the record. The main point of the record was that there was a
judges: Pregerson, W. Fletcher, Berzon